Filed 12/11/23  P. v. Wynne CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079600 |
| v. | (Super.Ct.No. INF1801841) |
| ALEC WYNNE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dean Benjamini, Judge. Affirmed.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Sahar Karimi and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury found defendant and appellant Alec Wynne guilty as charged in two counts of committing a lewd act on a child under the age of 14. (Pen. Code, § 288, subd. (a);[1] counts 1-2.) The jury also found a multiple-victim enhancement allegation true. (§ 667.61, subds. (e)(4), (j)(2).) The victims in counts 1 and 2, respectively, were defendant's step-granddaughters, sisters Jane Doe and Mary Doe. Defendant was sentenced to concurrent terms of 25 years to life on counts 1 and 2. The court imposed a $300 restitution fine (§ 1202.4, subd. (a)) and stayed a $300 parole revocation fine (§ 1204.45, subd. (c)).

In this appeal, defendant claims the trial court prejudicially erred (1) in admitting "two-year old fresh complaint evidence" on count 1, and (2) in instructing the jury on child sexual abuse accommodation syndrome (CSAAS) pursuant to CALCRIM No. 1193. Defendant claims the fresh-complaint evidence was too old to be admissible as such, and CALCRIM No. 1193 is unconstitutional on its face because it allows the jury to consider CSAAS testimony in evaluating the credibility of the complaining witness.

Defendant further claims (3) the cumulative effect of the trial court's errors requires reversal, and (4) the $300 restitution fine must be stricken because the trial court did not consider defendant's inability to pay the fine due to his advanced age and physical disability. At the time of sentencing on August 12, 2022, defendant was

---

[1] Undesignated statutory references are to the Penal Code.

73 years old, and he was using a wheelchair due to a partial amputation in 1991 of his left leg, below the knee. He formerly used a prosthetic leg.

We affirm the judgment in all respects.

## II.  FACTUAL BACKGROUND

A.  *Prosecution Evidence*

1.  <u>Jane Doe (Count 1)</u>

(a)  *Defendant's Prior Lewd Act Against Jane*

Jane testified that, when she five or six years old, she and her younger cousin Julie Doe were staying the night at the home of her grandmother and defendant in Northern California. That evening, Jane was lying on her stomach watching television on a bed in the grandmother and defendant's bedroom when defendant came into the room, put his hand up Jane's nightgown, and rubbed her bare buttocks. When the incident happened, the grandmother and Julie were in the kitchen. Jane did not understand why defendant touched her, and she was afraid of defendant. Jane called her mother and asked her mother to pick her up, but her mother was unable to do so until the next day. Jane did not tell her mother that defendant touched her. That night, to feel safe, Jane slept in a closet with her cousin Julie.

(b)  *The Charged Lewd Act Against Jane*

When Jane was 9 or 10 years old, defendant and Jane's grandmother visited Jane's home in Desert Hot Springs. Jane was afraid defendant would touch her again. One night, Jane slept on a bed next to her grandmother, in a bedroom, and Jane's cousin Julie slept on the floor. Defendant was sleeping on the couch in the living room. Jane awoke

3

to find defendant lying on the bed next to her, with his finger inside her vagina, underneath her clothes. Jane's grandmother was still asleep on Jane's other side. Jane felt pain in her vaginal area. Jane got up from the bed, went to the restroom, and started crying.

(c) *Jane's Additional Testimony*

Jane had nightmares after defendant touched her bare buttocks when she was five or six years old. After defendant put his finger inside her vagina at her home in Desert Hot Springs when she was 9 or 10 years old, Jane would go to her aunt and uncle's home next door, and stay there all day when she knew her grandmother and defendant would be visiting her home. Jane did not tell anyone about what defendant had done until she was older. As she became older, she began learning in school about molestation "and speaking up," so she finally disclosed the molestations to her aunt, Sonia A. In a video-recorded forensic interview, which was played for the jury, Jane described the molestations and her disclosure to Sonia.

(d) *The Fresh-complaint Evidence*

Sonia testified that, when Jane was 13 years old and living next door to Sonia in Desert Hot Springs, Jane told Sonia that defendant had touched Jane's "private parts" on multiple occasions. Jane also told Sonia (1) Jane knew defendant and her grandmother were coming to visit Jane's home in Desert Hot Springs, (2) Jane was afraid defendant would touch her again during the visit, and (3) Jane had nightmares about the prior molestations after they occurred. Soon thereafter, Sonia told Jane's mother what Jane had told Sonia.

4

## 2. Mary Doe (Count 2)

Jane's sister Mary is one year younger than Jane.  Mary testified that, when she was 8 or 9 years old, defendant and his wife (Mary's grandmother) visited Jane and Mary's home in Desert Hot Springs.  When Mary was alone in her room, defendant came into the room, hugged Mary, stuck his tongue in Mary's mouth to kiss her, and rubbed his erect penis against Mary's vaginal area.  Defendant was standing when he did these things; Mary knew defendant had a "metal" leg and had never known defendant to use a wheelchair.

A few days after the incident, Mary told her mother about what defendant had done.  In a separate conversation a few days after the incident, Mary also told Jane about the what defendant had done.  Mary did not see defendant again until the time of trial.  In a video-recorded forensic interview, which was played for the jury, Mary discussed the molestation incident and her disclosure of it to her mother.

## 3. Defendant's Other Lewd Acts

Jane and Mary's cousin Julie testified that, one night when she was six or seven years old, Julie and Jane were visiting their grandmother and defendant's home in Northern California.  Julie and Jane were sleeping next to each other on the floor in front of the bed where their grandmother and defendant were sleeping.  During the night, Julie awoke to find defendant using his hand to rub Julie's and Jane's bare backs, underneath their nightgowns.  Defendant also rubbed Julie's bare buttocks with his hand.  Julie saw that Jane's underwear was pulled down past her knees.  Julie did not see defendant touch Jane's bare buttocks, but she saw his hand "going down."  Later that night, Julie was in

5

the restroom, and when she opened the door to leave defendant was "right there." Defendant picked up Julie slowly, and rubbed his penis against her stomach and her vaginal area over her nightgown and underwear.

Jennifer Doe is Julie's sister and also a cousin to Mary and Jane. When Jennifer was five or six years old, defendant visited Jennifer's home. During a game of hide and seek with other children, Jennifer and defendant were alone in the backyard when defendant asked Jennifer to give him a hug. Defendant picked up Jennifer and slowly moved her up and down against his penis. Defendant also put his hands on Jennifer's breasts over her clothes and tried to put his hand on her chest through the neck of her shirt.

Janice Doe is unrelated to Jane, Mary, Julie, and Jennifer. In October 2015, when Janice was eight years old, Janice and her sister spent the night at the home of defendant and his wife in Northern California. Janice and her sister were sleeping on a bed when Janice awoke to find defendant rubbing Janice's vaginal area under her pants and underwear.

The next day at school, Janice wrote separate letters to her mother and defendant's wife, telling them defendant "put his hand down [her] pants under [her] underwear." The letter Janice wrote to her mother was admitted into evidence. Janice, Julie, and Jennifer spoke to forensic interviewers about the molestations, and video-recordings of the interviews were played for the jury. Defendant had a 2015 felony conviction for committing a lewd act with an eight-year-old girl. (§ 288, subd. (a).)

4. <u>CSAAS Evidence</u>

Dr. Veronica Thomas, a forensic psychologist, testified as an expert on child sexual abuse accommodation syndrome (CSAAS) and its five features or components: secrecy, helplessness, entrapment, disclosure, and retraction. Not all victims of child sexual abuse exhibit all five features. CSAAS is not a diagnostic tool; it cannot be used to determine whether a person has been sexually abused. CSAAS helps explain why victims of child sexual abuse are "not going to be perfectly straightforward, open and honest" about the abuse. Two forensic interviewers who testified for the prosecution also discussed aspects of CSAAS, including delayed disclosure.

B. *Defense Case*

The defense did not present any affirmative evidence. The defense claimed that Jane and Mary fabricated the charged molestations because they wanted to live with their father instead of their mother.

## III. DISCUSSION

A. *The Trial Court Did Not Abuse its Discretion in Admitting Sonia's Testimony as Fresh-complaint Evidence on Count 1*

Defendant claims the trial court abused its discretion in admitting "two-year old 'fresh complaint' evidence" on count 1 through the testimony of Jane's aunt, Sonia. Defendant argues that "Jane's disclosure falls squarely outside of the 'fresh complaint' doctrine as articulated in *People v. Brown* (1994) 8 Cal.4th 746" because Jane did not tell Sonia about the alleged molestations until two years after the most recent alleged molestation occurred.

7

1. The Motion in Limine to Admit Sonia's Testimony

The People filed a motion in limine to allow Sonia to testify that Jane told Sonia that defendant "touched [Jane] and made her uncomfortable" as fresh-complaint evidence on count 1. At the hearing on the motion, the prosecutor explained that Jane made the statement to Sonia in November 2017, two years after the charged lewd act in count 1 occurred; defense counsel argued the complaint was therefore too old to qualify as fresh-complaint evidence. The court ruled that the circumstances in which Jane made the complaint—when Jane was told her grandmother and defendant would be visiting Jane's home in Desert Hot Springs—weighed in favor of its admission because they lent it sufficient credibility and weight. Thus, the court ruled that Sonia's testimony about Jane's complaint to Sonia was admissible, subject to a limiting instruction that the complaint was not to be used as proof of the truth of the matter asserted in the complaint, namely, that defendant molested Jane.

2. Legal Principles

"The fresh-complaint doctrine originated with the 13th-century rule of 'hue and cry,' which required victims of rape and other violent crimes to alert the community immediately following the commission of the crime." (*People v. Brown* (1994) 8 Cal.4th 746, 754 (*Brown*).) Under the ancient rule, the victim's extrajudicial complaint was a necessary element of, and was therefore admissible as part of, the prosecution's case in chief. (*Ibid.*) Later, in the 19th century, courts developed the hearsay rule which bars the admission of extrajudicial statements to prove the truth of the matter asserted. (*Ibid.*) In sexual assault cases, however, the fresh-complaint doctrine replaced the hue and cry rule

8

and permitted the admission of evidence that the victim complained of a sexual assault while excluding the details of the complaint. (*Id*. at pp. 754-755.)

Under the fresh-complaint doctrine, a victim's extrajudicial complaint that a sexual offense occurred was not admissible to show that the offense occurred; it was only admissible to show that the victim promptly complained of the offense after it occurred. (*Brown*, *supra*, 8 Cal.4th at p. 755.) Fresh-complaint evidence served to dispel the notion in the minds of jurors that, if the victim *did not* complain of the offense to someone, promptly after it occurred, then the alleged offense must not have occurred and the victim must not be telling the truth in testifying at trial that the offense occurred. (*Ibid*.)

To be admissible under the old fresh-complaint doctrine, "the complaint must have been truly 'fresh' or 'recent,' under the rationale that, if not volunteered promptly following commission of the offense, the complaint no longer could negate legitimately the inference that the victim had remained silent in the aftermath of the alleged offense." (*Brown*, *supra*, 8 Cal.4th at p. 756.) In more recent times, "one of the historical premises of the fresh-complaint doctrine—namely, that it is 'natural' for the victim of a sexual offense to disclose promptly the commission of the offense in the event it did occur— largely has been discredited . . . ." (*Id*. at p. 759.)

In *Brown*, our Supreme court revised the fresh-complaint doctrine "to reflect a more accurate understanding of the proper basis for the admission" of fresh-complaint evidence. (*Brown*, *supra*, 8 Cal.4th at pp. 749, 757-758.) *Brown* held that, "*under principles generally applicable to the determination of evidentiary relevance and admissibility*, proof of an extrajudicial complaint, made by the victim of a sexual offense,

9

disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Id.* at pp. 749-750.)

Under *Brown*, the timing or " 'freshness' "of a complaint that a sexual offense occurred (whether the complaint was made promptly after the offense or at a later date) and the circumstances under which the complaint was made (whether the complaint was volunteered or was made in response to an inquiry) are not "essential prerequisites" to the admission of the complaint as fresh-complaint evidence. (*Brown*, *supra*, 8 Cal.4th at pp. 750, 763.) Rather, "evidence of the fact of, and the circumstances surrounding, an alleged victim's disclosure of the offense may be admitted in a criminal trial for nonhearsay purposes," provided the evidence is both relevant to the issues in the case and is not subject to exclusion under Evidence Code section 352. (*Brown*, at p. 763.)

We review a trial court's ruling on the admission and exclusion of fresh-complaint evidence under the abuse of discretion standard. (*People v. Thompson* (2010) 49 Cal.4th 79, 128.) The court's ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) As we explain, the trial court here did not abuse its discretion in admitting Sonia's testimony as fresh-complaint evidence on count 1.

10

3. Analysis

Defendant argues that Jane's extrajudicial statement to Sonia that defendant had molested Jane on prior occasions was inadmissible as fresh-complaint evidence because it was not made "immediately following" the alleged molestations but was "preceded by a very lengthy two-year delay." Defendant argues that, although *Brown* "did not specify a maximum acceptable time of delay" and held that a complaint may still be deemed " 'fresh' " if there is " 'some delay' " between the sexual offense and the victim's complaint or disclosure, "common sense and fairness dictates there must be some outer bound on the length of the delay before the complaint can no longer be considered a 'fresh' complaint within the meaning of *Brown*." Defendant claims a two-year delay in reporting the alleged offense exceeds this "outer bound." We disagree.

As noted, under *Brown*, the admissibility of fresh-complaint evidence "does not turn invariably upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered." (*Brown*, *supra*, 8 Cal.4th at p. 763.) Rather, the fact of the complaint and the circumstances surrounding its making "may be relevant for a variety of nonhearsay purposes, regardless whether the complaint is prompt or delayed." (*Id*. at p. 761.)

Here, the trial court reasonably concluded that Jane's "two-year old" complaint to Sonia was not too old to be admissible as fresh-complaint evidence given the circumstances in which Jane made the complaint. As the court observed, Jane did not make the complaint "out of the blue for no reason"; rather, Jane made the complaint to her aunt Sonia after Jane learned that defendant was coming to visit Jane's home in

11

Desert Hot Springs and, Jane feared, might molest Jane again during the visit. Thus, the court reasonably concluded that the circumstances in which the complaint was made lent the complaint sufficient "credibility" and "weight" to make it admissible as fresh-complaint evidence. Indeed, the circumstances surrounding Jane's making of the complaint showed that Jane made the complaint because Jane feared defendant would molest Jane again during his upcoming visit to Jane's home.

If the jury did not hear that Jane disclosed the alleged molestations to Sonia, two years after the most recent alleged molestation occurred, and the circumstances in which Jane made the disclosure, the jury could have been "left with an incomplete or inaccurate view of all the pertinent facts." (*Brown*, *supra*, 8 Cal.4th at p. 761.) The jury may have inferred that the molestations did not occur based on the "factually erroneous inference" that Jane never told anyone about the alleged molestations before her 2017 forensic interview, which occurred more than two years after Jane was claiming that the most recent and charged molestation occurred. Given the circumstances in which Jane made the complaint, the fact of the complaint and its surrounding circumstances were highly probative of whether Jane fabricated the molestations more than two years after they occurred. (See *Brown*, at pp. 761-762.)

Further, there was no risk that the jury would use the fresh-complaint evidence for an improper hearsay purpose. The jury only heard Sonia testify that Jane said defendant had molested her on prior occasions; that Jane knew defendant and her grandmother were coming to visit Jane's home; that Jane was afraid defendant would touch her again during the visit; and that Jane had had nightmares about the prior molestations. Sonia did not

12

testify to any details of the alleged molestations—details that a trier of fact could have used for the improper hearsay purpose of inferring that the molestations occurred. (*Brown*, *supra*, 8 Cal.4th at pp. 760-762.)

Thus, the court "carefully limited the scope of Sonia's testimony to fall within *Brown's* restrictions." (*Brown*, *supra*, 8 Cal.4th at p. 762.) The court limited the fresh-complaint evidence (Sonia's testimony) to the fact a complaint was made and the circumstances of its making. (*Ibid.* ["So long as the evidence that is admitted is carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose, admission of such relevant evidence should assist in enlightening the jury without improperly prejudicing the defendant."].) Lastly, no part of Sonia's testimony was subject to exclusion under Evidence Code section 352. (See *Brown*, *supra*, 8 Cal.4th at p. 763.) Thus, the trial court did not abuse its discretion in admitting Sonia's testimony as fresh-complaint evidence.

B. *The Jury Was Properly Instructed on CSAAS Pursuant to CALCRIM No. 1193*

Defendant claims the trial court violated his state and federal due process rights in instructing the jury that it could consider CSAAS testimony in evaluating the credibility of Jane's and Mary's testimony pursuant to CALCRIM No. 1193 (Testimony on Child Abuse Accommodation Syndrome). We find no merit to this claim.[2]

---

[2] The People argue defendant has forfeited his claim that CALCRIM No. 1193 was erroneously given because defendant did not object to the instruction in the trial court. We address the claim, given that the claim is that the instruction is not "correct in

*[footnote continued on next page]*

1. The Given Version of CALCRIM No. 1193

The trial court gave a modified version of CALCRIM No. 1193, in part to reflect that three witnesses (Dr. Thomas and two forensic interviewers) testified about CSAAS: "You've heard testimony regarding child abuse accommodation syndrome. Testimony about child sexual abuse accommodation syndrome is not evidence the defendant committed . . . any of the crimes charged against him or any conduct or crime for which he was not charged. You may consider this evidence only in deciding whether or not (Jane Doe)'s and (Mary Doe)'s conduct was not inconsistent with the conduct of someone who has been molested *and in evaluating the believability of their testimony*." (Italics added.) In lieu of the italicized phrase, the pattern instruction states: "and in evaluating the believability of *the alleged victim*." (CALCRIM No. 1193, italics added.)

The given version of CALCRIM No. 1193 also omitted the part of the official or pattern instruction that states: "Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse." (*Ibid*.)

2. Legal Principles

We review claims of instructional error de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) " 'The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law

law" and that the alleged error in giving the instruction affects defendant's substantial rights. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.)

14

. . . ." ' [Citation.] 'The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California.' (Cal. Rules of Court, rule 2.1050(a).)" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175.) "[E]xpert testimony on the common reactions of child molestation victims [(CSAAS testimony)] is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1302.)

3. Analysis

Defendant claims that CALCRIM No. 1193, both in its official or pattern version and as given here, violated his state and federal due process rights to a fair trial because it allowed the jury to use CSAAS testimony to determine whether Jane's and Mary's molestation claims were true. Defendant argues that, because CALCRIM No. 1193 allows the jury to use CSAAS testimony to evaluate " 'the believability' " of the alleged victim, "it is almost certain the jurors would utilize the CSAAS testimony . . . as supportive of the truth of the charges made against the defendant."

A similar claim was rejected in *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*). There, the defendant claimed that CALCRIM No. 1193 is internally inconsistent because it states that CSAAS testimony "is not evidence" that the defendant

15

committed a charged [or uncharged] offense, but it also states that the jury may use CSAAS testimony in evaluating the believability of the alleged victim's testimony. (*Gonzales*, at p. 503-504.)  In rejecting the claim, *Gonzales* first observed that CALCRIM No. 1193 has to be understood in the context of the CSAAS evidence in the case, which showed that the purpose of CSAAS evidence "is to understand a child's reactions when they have been abused," but that "CSAAS is not helpful in determining whether a child has, in fact, been abused."  (*Gonzales*, at p. 504.)

In light of the CSAAS testimony, the *Gonzales* court concluded, "[a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the victim's] behavior does not mean [the victim] lied when she said she was abused.  The jury would also understand it cannot use [the CSAAS] testimony to conclude [the victim] was, in fact, molested.  The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] CSAAS testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.  There is no conflict in the instruction."  (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

We find *Gonzales* persuasive and follow its reasoning.  The CSAAS evidence in this case was similar to the CSAAS evidence in *Gonzales*.  Here, Dr. Thomas explained that CSAAS is not a diagnostic tool; it cannot be used to determine whether a child has been sexually abused, but it can explain why child victims of sexual abuse are not going "to be perfectly straightforward, open and honest" about the abuse.  In addition, the two

16

forensic interviewers who testified about CSAAS discussed its delayed disclosure aspect. Thus here, as in *Gonzales*, the CSAAS evidence explained why CSAAS cannot be used as evidence that a molestation occurred, and is only useful in explaining the apparently self-impeaching behavior of child victims of sexual abuse. (*Gonzalez*, *supra*, 16 Cal.App.4th at pp. 503-504.)

Defendant claims *Gonzales* was wrongly decided and urges us not to follow it. Again, he argues that CALCRIM No. 1193 is inconsistent because, "if the CSAAS testimony is used to conclude that the complaining witness did not lie, then it is necessarily being considered in support of that witness's charge of molestation." This argument conflates evidence of a molestation, which is typically shown (as it was here) by the victim's testimony, pretrial statements, and actions, with expert testimony about CSAAS, which merely explains why a child sexual abuse victim's apparently self-impeaching behaviors (e.g., delayed disclosure) are not necessarily inconsistent with the victim's claim of sexual abuse. The two concepts are consistent; they do not contradict one another. In addressing both concepts, CALCRIM No. 1193 is not internally inconsistent or self-contradicting. (*Gonzales*, *supra*, 16 Cal.App.5th at pp. 503-504; *People v. Munch* (2020) 52 Cal.App.5th 464, 474; *People v. Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 816.)[3]

---

[3] Further, on this record there is no reasonable likelihood that the jury misunderstood and misapplied CALCRIM No. 1193 as allowing it to use the CSAAS evidence in determining whether defendant committed any of the charged or uncharged crimes. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1001-1002 [the correctness of a jury instruction is determined from the entire charge of the court].) CALCRIM NO. 1193,

*[footnote continued on next page]*

17

C. *There Was No Cumulative Trial Error*

Next, defendant claims the trial court's evidentiary error in admitting Sonia's testimony as fresh-complaint evidence, together with the trial court's instructional error in giving CALCRIM No. 1193, had a cumulative prejudicial effect that requires reversal of the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 844 [The cumulative prejudicial effect of individual errors may require reversal].) Because we have found no individual trial court error, there is no cumulative prejudicial error. (*People v. Jablonski* (2006) 37 Cal.4th 774, 810.)

D. *There Was No Prejudicial Error in Imposing the $300 Restitution Fine*

Defendant claims his $300 restitution fine (§ 1202.4, subds. (a)-(c)) must be vacated because, in imposing the fine, the court did not consider defendant's inability to pay the fine based on defendant's age and physical disability. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).) We conclude there was no prejudicial *Dueñas* error in imposing the restitution fine without an ability-to-pay hearing (*id*. at pp. 1169-1172), because the record shows defendant is able to pay the fine over time, from prison wages and other resources.

1. Background

At the time of sentencing on August 12, 2022, defense counsel, in arguing that there were "circumstances in mitigation," pointed out that defendant was 73 years old and

---

considered with the other instructions, did not permit the jury to use CSAAS testimony as evidence that defendant committed any offense. (*Ibid.* [jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.) Nothing in the record indicates that the jury misunderstood and misapplied CALCRIM No. 1193.

had "a debilitating injury that he cannot navigate without the help of a wheelchair or a prosthetic leg that he doesn't have right now." After defendant addressed the court, the court imposed the concurrent 25-year-to-life terms on counts 1 and 2, noting that, given the multi-victim enhancement, there was " no place" for the court to consider any aggravating or mitigating circumstances. (§ 667.61, subds. (e)(4), (j)(2).) The court then imposed the $300 restitution fine (§ 1202.4) and imposed but stayed the $300 parole revocation restitution fine (§ 1202.45), with no objection from defense counsel. Defendant did not claim he was unable to pay the restitution fine or request an ability-to-pay hearing to determine whether he was able to pay the fine.

The probation officer's sentencing recommendation report confirms that defendant is 73 years old and has a "lower left leg partial amput[ation] below the knee" from a "trucking/train accident" in 1991. Defendant graduated high school in 1967. He worked for a grocery store for 15 years until 1985, when he left the job due to a back injury. Beginning in 1980, he sold life insurance, and in 1990 he began working as a truck driver. He last worked as a truck driver in 2016, earning $18 an hour. Since 2016, he had been collecting "disability benefits." His mental health is "good;" but he has asthma, high blood pressure, and high cholesterol. He qualified for appointed counsel on appeal.

2. The *Dueñas* Decision

*Dueñas* held that it violates due process under the federal and state Constitutions to impose court operations and facilities fees without first determining that the defendant has "the present ability to pay" them. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168-1169.) The court must also stay the execution of any restitution fine (§ 1202.4) unless the court

19

determines the defendant is able to pay the fine (*Id*. at p. 1172). "The same court that decided *Dueñas* has since clarified that, at the ability to pay hearing, the defendant bears the burden of showing his or her inability to pay, and the court 'must consider all relevant factors,' including 'potential prison pay during the period of incarceration to be served by the defendant.' " (*People v. Taylor* (2019) 43 Cal.App.5th 390, 397-398.)

Several courts have concluded that *Dueñas* was wrongly decided and have declined to follow it. (E.g., *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1068; *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, review granted Nov. 26, 2019, S258946; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Adams* (2020) 44 Cal.App.5th 828, 831; see *People v. Taylor, supra,* 43 Cal.App.5th at p. 398 [discussing cases criticizing *Dueñas*].) Our Supreme Court is reviewing two questions that lie at the heart of *Dueñas*: (1) whether the court is required to consider the defendant's ability to pay before it may impose or execute fines, fees, and assessments; and (2), if so, whether the defendant or the People bear the burden of proving the defendant's inability to pay. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 (*Kopp*).) In deciding *Kopp*, our Supreme Court will resolve the split in authority. (*People v. Taylor*, at p. 398.)

3. Analysis

As noted, defendant claims his $300 restitution fine (§ 1202.4, subds. (a)-(c)) must be vacated because, in imposing the fine, the court did not consider defendant's inability to pay the fine based on his age and physical disability (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1169-1172.) At sentencing, defendant did not object to the fine or request a

20

hearing to determine his ability to pay the fine. But, for multiple reasons, defendant claims the forfeiture doctrine does not apply to his claim of *Dueñas* error. Alternatively, defendant claims his counsel rendered prejudicial ineffective assistance of counsel in failing to object to the fine on *Dueñas* due process grounds.

The People do not argue that *Dueñas* was wrongly decided. Rather, they claim (1) defendant has forfeited his claim that the fine should not have been imposed without a judicial determination of his ability to pay it, given that he did not object to the fine or request an ability to pay hearing at or before the time of sentencing; (2) *Dueñas* does not apply to a statutory minimum, $300 restitution fine (§ 1202.4, subd. (a)-(c)); and (3) any *Dueñas* error in imposing the fine was harmless beyond a reasonable doubt because the record shows defendant is able to pay the fine over time. Thus, the People argue (4) defendant cannot show he was prejudiced by his counsel's failure to object to the fine. Setting aside the question of forfeiture, we agree with the People that any *Dueñas* error in imposing the minimum $300 restitution fine was harmless beyond a reasonable doubt. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) Thus, it is unnecessary to determine whether the due process principles articulated in *Dueñas* apply to a $300 minimum restitution fine. (§ 1202.4, subds. (a)-(c).) And defendant cannot show his counsel rendered prejudicial ineffective assistance in failing to object to the fine. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [To establish a claim of ineffective assistance of counsel, the defendant must show there is a reasonable probability that counsel's error affected the outcome of the case].)

21

The entire record shows that defendant will be able to pay the $300 restitution fine over time from wages he can earn in prison or from his "disability benefits." (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035; *People v. Aviles, supra,* 39 Cal.App.5th at p. 1076; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.) Although defendant is 73 years old, and he must use a wheelchair if he does not have a prosthetic leg, he has no other physical disabilities. His mental health is "good" and his social and employment history shows he is intelligent. Thus, he can use his intelligence and his hands to work, and earn wages in prison, even if he must use a wheelchair, and pay the fine from his prison wages. He may also use his disability benefits to pay the fine over time. In sum, on this record defendant cannot meet his burden of showing he is unable to pay the $300 restitution fine. (*People v. Taylor*, *supra*, 43 Cal.App.5th at pp. 397-398 ["[A]t the ability to pay hearing, the defendant bears the burden of showing his or her inability to pay . . . ."].)

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


McKINSTER _____
Acting P. J.


RAPHAEL _____
J.